IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES | ) | |
| | ) | CR 18-218 |
| V. | ) | |
| | ) | |
| EVAN JONES | ) | |

**OPINION AND ORDER**

**SYNOPSIS**

In this action, Defendant has been charged with violating 21 U.S.C. §§841(a)(1) and 841(b)(1)(C), on July 26, 2018. Defendant has filed a Motion to Suppress Physical Evidence, challenging the traffic stop and ensuing searches that led to the seizure of evidence from Defendant's vehicle. As a threshold matter, Defendant argues that the police did not have probable cause to conduct the initial traffic stop. The Government opposes Defendant's Motion, on grounds that Defendant committed, or the officers reasonably believed that Defendant committed, a violation of 75 Pa. §3334(a) preceding the traffic stop. Moreover, Defendant contends that the officers did not have consent to search his vehicle, or that the search exceeded the scope of that consent. The Government contends that the officers had valid consent to perform the search, and if they did not, the automobile exception applies.

The Court held a hearing on Defendant's Motion on April 10, 2019. Subsequently, the Court directed the Government to brief the applicability of Commonwealth v. Staples, No. 1945 EDA 2017, 2019 Pa. Super. Unpub. LEXIS 1307 (Apr. 9, 2019). Defendant's Motion has been fully briefed, and is now ripe for review. For the following reasons, the Motion will be denied.

**OPINION**

I. **BACKGROUND**

At a hearing on Defendant's Motion to Suppress, three officers testified: Sean Rattigan, Charles Wilker, and James Embree. On July 26, 2018, law enforcement officers were conducting surveillance to "watch for potential illegal drug activity relative to the Defendant" in a known drug trafficking area. Transcript of April 10, 2019 Hearing ("Tr.") p. 6. Otherwise stated, the "mission was to conduct surveillance on…the Defendant." Id. at p. 40. As Embree stated, "we had information that…the Defendant was a drug dealer and was trafficking drugs in the area…" Id. at p. 8. Two officers, Sean Rattigan and Charles Wilker, had information that Defendant was there, and was a drug dealer. Id. at pp. 31, 20-21. Embree observed Defendant and another man engaged with a vehicle parked at the Oliver Plaza Apartments ("Oliver Plaza") in Duquesne. Id. at pp. 7-8. At the Motion hearing, officer James Embree confirmed that the Defendant and vehicle were "in the parking lot of that [Oliver Plaza] apartment complex." Id. at pp. 7-8. Embree testified that Defendant and the other man entered the vehicle, with Defendant driving out of the Oliver Plaza Parking lot and onto Route 837. Id. at pp. 9-10. The vehicle was next seen by Embree a short distance away, in the lot of an Exxon gas station on Route 837. Id. at p. 10.

At all pertinent times, Wilker and Rattigan were traveling together in the same vehicle. Id. at p. 30. Bearing directly on the Oliver Plaza situation, Wilker testified that he observed Defendant "leave Oliver Plaza and travel down towards 837," that he followed the vehicle, and was able to constantly see the vehicle, including the failure to signal "when he got to 837." Id. at p. 31. Wilker testified that he was able to personally observe Defendant fail to signal his left turn "out of that area [referring to Oliver Plaza]," because "we were directly behind him." Id. at p.

2

40.  Rattigan, however, who was in the same vehicle as Wilker, described his position at the time: "I was not immediately behind. I was one or two vehicles behind [Defendant's vehicle]." Id. at p. 72.  Wilker and Rattigan testified that they observed Defendant pull out from the Oliver Plaza parking lot and onto Route 837 without using his turn signal. Id. at pp. 31, 40, 61, 71.

Embree, Wilker, and Rattigan observed Defendant in the Exxon lot, and Embree and Rattigan stated that they observed Defendant fail to use his turn signal when exiting the lot and pulling onto Route 837.  Id. at pp. 10, 14, 41, 61, 71. In addition, Embree, Wilker, and Rattigan all testified to their belief that it is a traffic violation under Pennsylvania law to turn from either the apartment lot or the gas station onto a major artery without signaling that turn. Id. at pp. 25, 31-32, 62.

The officers did not initiate a stop immediately after they observed Defendant exit the Oliver Plaza. Wilker explained: "There was heavy vehicle traffic, and the Defendant pulled into an Exxon gas station."  Id. at p. 32.  He explained, again, that no stop occurred because of heavy traffic on Route 837 and the proximity of the Exxon station to the initial failure to signal.  Id. at p. 8.  As described in the briefs, the officers continued to follow Defendant's vehicle to an intersection that was no more than two or three miles past the Exxon station until it stopped at a red light; the subject traffic stop ensued.  Id. at pp. 40-42. As a result of the stop, the officers searched the vehicle and seized evidence that lead to Defendant's indictment, including pills and heroin. Id. at p. 67.

## II.  DEFENDANT'S MOTION

> For Fourth Amendment purposes, a traffic stop is a seizure of both the driver and any occupants of a vehicle.  However, when an officer has reasonable suspicion to believe that a traffic violation has occurred, the officer may stop the vehicle. If reasonable suspicion for the traffic stop is found to be lacking, evidentiary fruits of the traffic stop must be suppressed.

3

United States v. Neal, No. 17-255, 2018 U.S. Dist. LEXIS 100798, at *8 (M.D. Pa. June 15, 2018).

A technical violation of the traffic code, observed prior to initiating the stop, justifies the stop. United States v. Gooch, 915 F. Supp. 2d 690, 703 (W.D. Pa. 2012). Thus, the Government bears the initial burden of both identifying the statute believed to have been violated, and providing "specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction." Id. at *703; United States v. Delfin-Colina, 464 F. 3d 392, 397, 399 (3d Cir. 2006). "As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination." Delfin-Colina, 464 U.S. at 399-400.

Pursuant to Commonwealth v. Staples, No. 1945 EDA 2017, 2019 Pa. Super. Unpub. LEXIS 1307 (Apr. 9, 2019),[1] the Defendant's purported failure to signal at the Exxon station cannot support the traffic stop. Section 3334(a) does not apply to turns originating in the lots, and the pertinent statutory provisions are not ambiguous. Their plain language should have alerted officers to their mistake. A reasonable officer correctly interpreting Section 3334(a) would not have reasonably suspected that Defendant was violating the statute. See, e.g., Cole, 874 N.E.2d at 89; Delfin-Colina. As the Court of Appeals for the Eleventh Circuit has stated, there is a "fundamental unfairness [in] holding citizens to 'the traditional rule that ignorance of the law is no excuse'… while allowing those 'entrusted to enforce' the law to be ignorant of it." United

---

[1] Staples is a non-precedential, unpublished decision. "While the Pennsylvania rules prohibit the Pennsylvania state courts from citing unpublished (or non-precedential) opinions, such prohibition does not apply to federal courts. While an unpublished opinion of a Pennsylvania state court cannot be taken as stating Pennsylvania law, and therefore has no precedential value, the Court is nonetheless at liberty to rely upon it as persuasive authority regarding the thoughts and opinions of learned Pennsylvania jurists." Schwartz v. Abex Corp., 106 F. Supp. 3d 626, 649 n.63 (E.D. Pa. 2015). Staples merely informs today's decision.

4

States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) (quoting Bryan v. United States, 524 U.S. 184, 196, 118 S. Ct. 1939, 1947, 141 L. Ed. 2d 197, 208 (1998)) (citation omitted).

The Court agrees with Defendant that his alleged failure to signal when exiting the Exxon parking lot did not, under Staples, justify a subsequent stop; the officers' misapprehension that Section 3334 applied to a turn initiated in a parking lot did not furnish the requisite reasonable suspicion. Defendant's alleged failure to signal from the Oliver Plaza, however, differs. Unlike the turn from the Exxon lot, the record is unclear regarding the precise location in which Defendant initiated his turn from the Oliver Plaza. The testimony reflects that Defendant did not pull directly from the parked position, in the Oliver Plaza parking lot where Embree first observed him, onto Route 837. Defendant testified that he proceeded from the Oliver apartments "down the alleyway, and…turned in front of the Save-A-Lot, and then…turned left onto…I forget the street…and I made a left…."; he stated that he "made a left to go on the street before making a left to get on 837." Tr. pp. 105-06. Indeed, Defendant does not specifically argue that the Oliver Plaza turn is governed by Staples.

Defendant, however, testified that he did in fact signal when making the above-described turn, and challenges the officers' credibility.[2] The Court may assess witness credibility, and may reject any or all of a witness's testimony. United States v. Murphy, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). Credibility is assessed based on factors such as "the witness's ability to accurately recollect the matters at hand," the extent to which the testimony is corroborated or contradicted by other evidence, the manner in which the witness may be affected by the outcome, and whether the testimony "withstands a common sense test of reason and logic." Id.

---

[2] Again, Embree did not observe the Oliver Plaza traffic violation. Embree testified that he observed that Defendant, after being parked at the Oliver Plaza, "drove away and kind of went down over the hill. Tr. p. 10. Embree then lost sight of him until the Exxon station. Id.

5

at 569. A defendant's testimony, and that of law enforcement officers, are to be judged in the same way as the testimony of any other witness. Id. at 569-70.

Although Defendant's testimony at the hearing was generally credible, the testimony of two officers that they observed the failure to signal while Defendant turned onto 837 are in accord, and this corroboration lends the testimony weight. In the context of credibility, Defendant cites to Murphy and United States v. Gant, 412 F. Supp. 2d 451 (E.D. Pa. 2005), which are distinguishable from this case. The multiple "contradictions and implausibilities" that the Court found with the officers' testimony in Gant, and the lack of recall, inconsistencies, and qualified responses that undermined the officers' testimony in Murphy, are not present here. I note, too, that the testimony of Rattigan and Wilker are not necessarily or blatantly inconsistent.[3] For example, the term "directly behind" just as likely connotes linear positioning behind Defendant's vehicle, as it connotes proximity and the absence of intervening vehicles. Other potential discrepancies do not bear directly on the facts pertaining to the Oliver Plaza stop. Thus, I credit the testimony of officers Rattigan and Wilker that they observed Defendant fail to signal when traveling from Oliver Plaza and turning onto Route 837, which they reasonably suspected was a violation of Section 3334. This failure to signal, therefore, supports the legality of the subsequent traffic stop.

### C. AUTOMOBILE EXCEPTION

At the hearing, Rattigan testified that Defendant consented to the search of his vehicle, and Defendant testified that he refused such consent. The disagreement need not be resolved.

---

[3] At all pertinent times, Wilker and Rattigan were traveling together in the same vehicle. Tr. p. 30. Wilker testified that another officer, Bob Cross, was at the Exxon station and observed Defendant and his passenger enter the Exxon and come back out. Id. Wilker saw Defendant park in the Exxon lot, because "we passed him." Id. at p. 41. Wilker testified that he himself did not see the vehicle leave the Exxon and return to Route 837. He and Rattigan were stationed down the street, and they "were informed by conference call that he was leaving and turning onto 837." Id. Thus, Wilker stated that he did not observe the lack of a turn signal when Defendant exited the Exxon. Id. Rattigan, however, testified that he observed Defendant fail to signal when Defendant pulled out of the Exxon. Id. at p. 61.

6

Even if the search were not supported by consent, or exceeded valid consent, the automobile exception to the warrant requirement supports the constitutionality of the search.

The automobile exception permits the search of a vehicle if "probable cause exists to believe it contains contraband." United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002). "While a … search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the 'ready mobility' of automobiles permits their search based only on probable cause." Id. at 100 (citing Maryland v. Dyson, 527 U.S. 465, 466-67, 119 S. Ct. 2013, 144 L. Ed. 2d 442 (1999)). Our Court of Appeals has affirmed that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Rickus, 737 F.2d 360, 367 (3d Cir. 1984) (emphasis in original). The Government bears the burden of demonstrating that the exception applies. United States v. Kennedy, No. 13-240, 2014 U.S. Dist. LEXIS 159802, at *41 (W.D. Pa. Nov. 13, 2014) (quoting Donohue, 764 F. 3d at 330).

Probable cause exists when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); United States v. Bond, 581 F.3d 128, 139 (3d Cir. 2009). In determining whether probable cause existed, courts are to evaluate "the events which occurred leading up to the search, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014). Probable cause is "'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'" Kennedy, 2014 U.S. Dist. LEXIS 159802, at *40 (quoting Gates, 462 U.S.at 232).

It is helpful to recount, once more, the testimony relevant to this inquiry. In this case, the officers had information that Defendant was a drug dealer, and was trafficking in the area. Tr. pp. 8, 31, 39, The interior of the vehicle had multiple loose panels and misaligned parts; "nothing was in its proper position inside the vehicle," according to Rattigan. Id. at p. 78.[4] Both Rattigan and Wilker testified that in their training and experience, drugs are often secreted in hidden compartments in vehicles. Id. at pp. 28-29, 36. Wilker, who removed the panels and found the drugs, stated his knowledge that drugs are commonly hidden in the doors and dashboard of a vehicle. Id. at 36. Rattigan testified that based on his training and experience, people conceal narcotics in vehicles by manipulating screws, loosening screws, clips or fasteners, and removing and replacing panels. Id. at p. 60. Often, they are "loosely replaced and not affixed the way they were from the factory." Id.

Rattigan, who participated "somewhat" in the search, looked under, in back of, and behind the seats, and "manipulated some panels." Id. Defendant testified that he observed the officers search under the hood and the front of the engine. Id. at 94. Wilker "noticed that [the handle] wasn't attached fully to the arm of the door." Id. at pp. 47, 49. Wilker also noticed that a clip that secures the dashboard "appeared to be broke." Id. at p. 51. He testified as follows: "[T]he screws were taken out of the actual handle; the handle was loose. There's clips that hold the dashboard together; they were not fastened properly. You could tell they were manipulated." Id. at p. 36. Rattigan, when asked whether he noticed that the dashboard panel had been manipulated, replied in the affirmative. Id. at p. 67. Without using tools, Wilker then took the plastic door handle off, looked inside, and saw a bag of pills "shoved in the door." Id. at p. 36.

---

[4] Defendant characterized the condition of the panels as follows: "I can't say that they would be as tight as a new car, but I can't also agree that they were just flat out loose that you could move them and pull out; that you have to use some type of force to physically remove the panels." Tr. pp. 100-01.

Thereafter, Wilkers pulled the panel off the dashboard, exposing the vent area, and saw a glove in the vent; the glove contained white powder, later determined to be heroin. Id. at pp. 37-38.

It is true that United States v. Gooch, 915 F. Supp. 2d 690 (W.D. Pa. 2012), and the cases on which it and the Government relies are, in several material respects, distinguishable from the present case. Nonetheless, a court must consider the totality of the circumstances when assessing whether probable cause exists. For example, the officers had information that Defendant was a drug dealer and that he was trafficking in the area, had training and experience relating to drugs being hidden in secret compartments in vehicles and the manipulation of interior panels for that purpose, and observed portions of the vehicle's interior that appeared to have been manipulated. Taken into consideration with the totality of circumstances, such factors have been found to support probable cause in a variety of contexts. Here, the circumstances suffice to create the required fair probability.

## CONCLUSION

In conclusion, the seizure at issue was supported by the Defendant's failure to signal when leaving the Oliver Plaza, and the search of his vehicle was valid under the automobile exception to the warrant requirement. Defendant's Motion to Suppress will be denied. An appropriate Order follows.

BY THE COURT:

_____

Donetta W. Ambrose
Senior Judge, U.S. District Court

Dated: May 30, 2019

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES | ) |
| | ) CR 18-218 |
| V. | ) |
| | ) |
| EVAN JONES | ) |

**ORDER**

AND NOW, this 30th day of May, 2019, it is hereby ORDERED, ADJUDGED, and DECREED that Defendant's Motion to Suppress is DENIED. Trial is scheduled for July 16, 2019, at 9:30 AM in Courtroom 3B before the undersigned. Motions in Limine are due June 10, 2019. Responses to the Motions in Limine are due June 17, 2019. Proposed voir dire and jury instructions are due June 24, 2019.

BY THE COURT:

_Donetta F. Ambrose_

Donetta W. Ambrose
Senior Judge, U.S. District Court